UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEUROGRAFIX ('360) PATENT LITIGATION | MDL No. 13-md-2432-RGS |
| | This document relates to: All Member Actions |
| | **FILED UNDER SEAL** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>CONSOLIDATED MOTION TO DISMISS</u>**

**LEAVE TO FILE EXCESS PAGES GRANTED ON MAY 13, 2013**

**LEAVE TO FILE UNDER SEAL GRANTED ON MAY 14, 2013**

## TABLE OF CONTENTS

I.   Introduction ................................................................................................................. 1

II.  Background .................................................................................................................. 3

   A.   Plaintiffs' Allegations Regarding Ownership of Patent Rights ...................................... 3

   B.   The Long and Tortuous History of the '360 Patent ....................................................... 3

      1.   The Patent Rights Were Initially Shared Between the University of Washington and St. George's Hospital Medical School. ................................................................... 3

      2.   Entities That Funded the Named Inventors' Research Had Rights to the '360 Patent .... 4

      3.   In March 1994, UW and WRF Executed an "Exclusive Technology License." ............. 5

      4.   In May 1994, UW, WRF, and St. George's Executed a Technology Administration Agreement. ........................................................................................................... 5

      5.   In 1998, WRF and NeuroGrafix Executed an Exclusive License Agreement. .............. 6

      6.   In 2011, NeuroGrafix, NIMA, and IBSC Divided NeuroGrafix's Alleged Patent Rights Among Themselves. ............................................................................................ 7

      7.   In June 2012, WRF and NeuroGrafix Executed an "Amended and Restated Non-Terminable Exclusive License Agreement." ....................................................... 7

III. Legal Standard ............................................................................................................ 8

IV.  Argument .................................................................................................................. 10

   A.   The University of Washington Still Holds Substantial Rights in the '360 Patent and Must Be a Plaintiff in These Actions. ......................................................................... 10

      1.   The UW-WRF License Did Not Transfer Any Rights in the '360 Patent to WRF Because the UW-WRF License Was Superseded by the TAA. ............................................ 10

         a.   Plaintiffs' Extrinsic Evidence of UW's, WRF's, and St. George's Intent Cannot Contradict the TAA's Unambiguous Language. ............................................. 11

         b.   Plaintiffs' Extrinsic Evidence Does Not Reveal St. George's Intent ..................... 12

      2.   The Rights St. George's Assigned to UW Were Not Licensed to WRF, So UW Still Holds Rights in the Patent ................................................................................... 13

      3.   UW Still Has a Right to Sue for Infringement Under the UW-WRF License. ............. 14

   B.   Even If UW is Not a Necessary Party, WRF Retains Substantial Rights in the '360 Patent. ................................................................................................................ 15

      1.   WRF Did Not Transfer to NeuroGrafix the Exclusive Rights to Import and Offer to Sell. 15

         a.   Plaintiffs Misplace Their Reliance on the Recitals to the Amended Agreement to Create a Grant of the Exclusive Right to Offer For Sale and Import .............................. 18

      b.      Plaintiffs Have Mischaracterized The *Aspex* And *Dexas* Cases As Holding That The Exclusive Rights To Offer For Sale And Import Are Immaterial ............................. 19

      c.      Plaintiffs' Argument That the Right to Exclude Third Parties From Selling Includes the Right to Exclude Third Parties from Offering to Sell is Incorrect. ............................ 21

      d.      Plaintiffs' Argument That NeuroGrafix's Purported Grant of Exclusive Rights to Offer for Sale and Import to NIMA Implies That NeuroGrafix Received Those Rights From WRF is Nonsensical. ............................................................................................. 22

   2.   The Amended Agreement Does Not Grant NeuroGrafix All Rights to Sue. ................ 22

   3.   The Amended Agreement Between WRF and NeuroGrafix Does Not Include Rights to the '360 Patent ......................................................................................................... 23

   4.   The Amended Agreement is Designed to Protect WRF's Financial Interests. ............. 23

   5.   The Amended Agreement is Subject to the Restrictions on WRF's Rights Under its Agreements With the University of Washington and St. George's. ..................................... 24

 C.   Plaintiffs' Divided Rights Deprive Them of Constitutional Standing Because No Plaintiff Has an Injury-In-Fact nor the Power to Sue on Behalf of the Others. ............ 25

   1.   The Purported Exclusivity of the Sublicenses to NeuroGrafix and IBSC is Illusory.... 25

   2.   IBSC is a Bare Licensee With No Standing Whatsoever. ............................................. 27

   3.   NeuroGrafix Lacks Constitutional Standing to Sue Because it Has Only a Bare Power to Sue Without Any Exclusive Right to Practice. .................................................................. 27

   4.   NIMA Has No Right to Sue ......................................................................................... 28

 D.   Plaintiffs Have Not Demonstrated That Leave to File Amended Complaints Would Be Justified, and The Court Should Dismiss With Prejudice. ........................................... 29

 E.   If the Court Does Not Immediately Dismiss This Case, Focused Jurisdictional Discovery is Warranted Based on Plaintiffs' Responses So Far. ................................. 30

V.  CONCLUSION ............................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alfred E. Mann Found. For Scientific Research v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010)..................................................................................14

*Amgen, Inc. v. Chugai Pharm. Co.*,
    808 F. Supp. 894 (D. Mass. 1992), *aff'd*, 52 F.3d 1026 (Fed. Cir. 1995)................................17

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
    434 F.3d 1336 (Fed. Cir. 2006)..................................................................19, 20, 21

*Corley v. United States*,
    556 U.S. 303 (2009) ..................................................................................22

*Delano Farms Co. v. California Table Grape Comm'n*,
    655 F.3d 1337 (Fed. Cir. 2011)..................................................................15

*Dexas Int'l, Ltd. v. Tung Yung Int'l (USA) Inc.*,
    No. 6:07-cv-334, 2009 U.S. Dist. LEXIS 34766 (E.D. Tex. Feb. 25, 2009) ...............19, 20, 21

*Diodem, LLC v. Lumenis Inc.*,
    No. 2:03-cv-02142, 2005 WL 6219898 (C.D. Cal. Sept. 14, 2005)......................................28

*E8 Pharms. LLC v. Affymetrix, Inc.*,
    680 F. Supp. 2d 292 (D. Mass. 2010) ..................................................................23

*Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*,
    357 F.3d 1266 (Fed. Cir. 2004)..................................................................9, 22

*Grey v. Leach*,
    244 P.3d 970 (Wash. Ct. App. 2010) ..................................................................18

*In re Marriage of Schweitzer*,
    937 P.2d 1062 (Wash. 1997)..................................................................12

*Israel Bio-Eng'g Project v. Amgen, Inc.*,
    475 F.3d 1256 (Fed. Cir. 2007)..................................................................9, 10

*Lucent Techs., Inc. v. Gateway, Inc.*,
    543 F.3d 710 (Fed. Cir. 2008)..................................................................30

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................8

*McDonald v. State Farm Fire & Cas. Co.*,
    837 P.2d 1000 (Wash. 1992)..................................................................18

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
   240 F.3d 1016 (Fed. Cir. 2001).........................................................................9

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008)..............................................................................9

*Morrow v. Microsoft Corp.*,
   499 F.3d 1332 (Fed. Cir. 2007)..............................................................9, 10, 17

*N. State Const. Co. v. Robbins*,
   457 P.2d 187 (Wash. 1969).............................................................................18

*NeuroGrafix v. Siemens Med. Sol'ns, USA, Inc.*,
   No. SA CV 10-1990 MRP (RZX) (C.D. Cal. June 30, 2010) ................................29

*Port Blakely Mill Co. v. Springfield Fire & Marine Ins. Co.*,
   110 P. 36 (Wash. 1910)..................................................................................21

*Propat Int'l Corp. v. RPost US, Inc.*,
   473 F.3d 1187 (Fed. Cir. 2007)...........................................................23, 27, 28

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617 (2008).......................................................................................26

*Rains v. Walby*,
   537 P.2d 833 (Wash. App. Ct. 1975).................................................................18

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
   402 F.3d 1198 (Fed. Cir. 2005)....................................................................27, 29

*Sicom Sys., Ltd. v. Agilent Techs., Inc.*,
   427 F.3d 971 (Fed. Cir. 2005).......................................................23, 29, 30

*Torres-Negrón v. J & N Records, LLC*,
   504 F.3d 151 (1st Cir. 2007).............................................................................9

*Waterman v. MacKenzie*,
   138 U.S. 252 (1891)................................................................................16, 20, 21

*WiAV Solutions LLC v. Motorola, Inc.*,
   631 F.3d 1257 (Fed. Cir. 2010).......................................................................17

## STATUTES

35 U.S.C. § 154(a)(1).......................................................................................8, 16

35 U.S.C. §§ 200-212 ..........................................................................................24

35 U.S.C. §§ 202-203 ......................................................................................24, 25

**RULES**

37 C.F.R. §§ 401.1-.17...................................................................................................................24

Fed. R. Civ. P. 12(b)(1) .............................................................................................................3, 9

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1, 9

Fed. R. Civ. P. 12(b)(7) ...............................................................................................................3

**OTHER REFERENCES**

A.G. Filler et al., *The History, Development and Impact of Computed Imaging in
        Neurological Diagnosis and Neurosurgery: CT, MRI, and DTI* (2009)...................................4

Filler et al., *Magnetic Resonance Neurography*, 341 Lancet 659 (March 13, 1993) .....................4

Pursuant to the Court's order, dated April 30, 2013, Defendants hereby respectfully submit their memorandum in support of their consolidated motion to dismiss.[1]

## I.   INTRODUCTION

Plaintiffs' complaints must be dismissed because NeuroGrafix, Neurography Institute Medical Associates, Inc. ("NIMA"), and Image-Based Surgicenter Corporation ("IBSC") lack constitutional and prudential standing to sue for infringement of U.S. Patent No. 5,560,360 ("the '360 patent").  As shown in Figure 1 on the next page, each step in the purported chain of title has multiple flaws, any one of which is fatal to jurisdiction.  The inventors, whose research was funded by several trusts in the United Kingdom ("UK Trusts") as well as the National Institutes of Health ("NIH") and GE Medical Systems, initially assigned their rights to both the University of Washington ("UW") and St. George's Hospital Medical School ("St. George's").  UW's attempt to license all its rights to Washington Research Foundation ("WRF") failed because (1) it was rendered null and void by a later agreement (the Technology Administration Agreement or "TAA"));  (2) UW retained a substantial right to sue infringers;  and (3) the license is subject to

---

[1]  Pursuant to paragraph 8 of the Procedural Order, the defendants in the stayed actions understand that "[a]ny orders, other than orders setting deadlines previously entered by this or any transferor district court, shall remain in full force and effect unless modified by this court upon application."  Although the stayed cases would necessarily be affected if the Court were to hold that Plaintiffs do not have constitutional or prudential standing to sue, this motion is not being made on behalf of the defendants to those cases, since doing so would be inconsistent with the cases being stayed and the Court's Procedural Order.  Specifically, the defendants to three of the stayed Massachusetts customer cases did not answer the complaints, but rather filed motions to dismiss that raised standing issues under Rules 12(b)(1) and 12(b)(7), as well as defects in the pleadings under Rule 12(b)(6).  *See* ECF Dkt. #32, *NeuroGrafix v. Beth Israel Deaconess Medical Center, Inc.*, C.A. No. 12-11274 (D. Mass.); ECF Dkt. #26, *NeuroGrafix v. Brigham and Women's Hospital, Inc.*, C.A. No. 12-11275 (D. Mass.); and ECF Dkt. #27, *NeuroGrafix v. Trustees of Boston University*, C.A. No. 12-11276 (D. Mass.).  After the Court entered orders staying those cases, the Court found the pending motions to dismiss moot in light of the stays, and ordered that the motions to dismiss may be "renewed should the case[s] return to the active docket."  *See* Elec. Orders, dated Dec. 11, 2012.  When and if the stays are lifted, and those defendants are required to respond to the complaints in the respective actions, they will determine whether to renew their motions under Rule 12(b)(6) at that time.



FIGURE 1

the U.S. Government's rights. A later attempted license from WRF to NeuroGrafix was incomplete because (4) it failed to transfer statutory patent rights; (5) WRF can still sue certain parties; (6) it does not actually cover the '360 patent; (7) WRF retained other substantial rights; and (8) it is also subject to the U.S. Government's rights from the UW-WRF agreement.

NeuroGrafix then licensed its rights to NIMA, which (a) attempted to license back to NeuroGrafix the right to sue for all three plaintiffs here, as well as an exclusive field of use, and (b) attempted to license to IBSC an exclusive field of use. These licenses were incomplete because (9) NIMA retained no right to sue; (10) IBSC received no right to sue; (11) IBSC's exclusive field of use is illusory; (12) NeuroGrafix's exclusive field of use is illusory; and (13) NeuroGrafix's right to sue was not connected to its exclusive field of use.

The chain of title is made even more complicated because (14) St. George's assigned its rights to UW after UW's attempted license to WRF, so UW possesses additional rights to the '360 patent. Moreover, although the UK Trusts that funded the inventors' research assigned their

2

rights to St. George's, NIH, and GE never assigned their rights (15, 16), so they may also be necessary parties to a suit for infringement of the patent.

Accordingly, because the three present plaintiffs lack constitutional standing to sue at all or, at the very least, lack prudential standing to sue without UW, WRF, NIH, and/or GE, these cases should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) or for failing to join a necessary party under Rule 12(b)(7).  Alternatively, if the Court finds that the record as developed thus far is insufficient to determine Plaintiffs' standing, the Court should initially limit discovery to the standing issue so that the Court may determine whether it has jurisdiction.

## II.   BACKGROUND

### A.   Plaintiffs' Allegations Regarding Ownership of Patent Rights

Plaintiffs have alleged that UW owns the '360 patent by assignment, UW granted WRF an exclusive licensee with substantially all rights to the patent, and that WRF, in turn, granted NeuroGrafix an exclusive license with substantially all rights to the patent.  Plaintiffs further allege that NeuroGrafix has granted an exclusive license with substantially all rights to the patent to NIMA, which granted back to NeuroGrafix an exclusive field-of-use license and granted to IBSC another exclusive field-of-use license.  According to Plaintiffs, these transactions left NeuroGrafix, NIMA, and IBSC each with an exclusive field-of-use, and standing for them to sue accused infringers without adding UW, WRF, or any other entity as a co-plaintiff.  The truth is considerably more complicated.

### B.   The Long and Tortuous History of the '360 Patent

#### 1.   The Patent Rights Were Initially Shared Between the University of Washington and St. George's Hospital Medical School.

On its face, the '360 patent names Drs. Aaron G. Filler, Jay S. Tsuruda, Todd L. Richards, and Franklyn A. Howe as co-inventors.  Ex. 1 ('360 patent), Cover Page.  Dr. Filler

assigned his rights in the application that matured into the '360 patent to both the UW and St.

George's in a single assignment executed on June 14, 1993.  Ex. 3 (Filler Assignment).  The next

day, Drs. Tsuruda and Richards assigned their rights to UW.  Ex. 4 (Tsuruda Assignment); Ex. 5

(Richards Assignment).  And Dr. Howe assigned his rights to St. George's that same day.  Ex. 6

(Howe Assignment).  Accordingly, the rights to the '360 patent were split at least between UW

and St. George's.

       2.     **Entities That Funded the Named Inventors' Research Had Rights to the '360 Patent.**

Several entities other than UW and St. George's apparently held rights to the '360 patent

as a result of the named inventors' grants or funding agreements with them.  Wellcome Trust and

St. George's Healthcare NHS Trust funded research for Dr. Filler, and Cancer Research

Campaign Technology Ltd. funded research for Dr. Howe.  *See* Exs. 15-17 (Funding Entity

Assignments).  These entities are the above-referenced UK Trusts.

Additionally, the National Institutes of Health ("NIH") funded Dr. Filler's research, and

GE Medical Systems funded Dr. Tsuruda's research.  *See* Filler et al., *Magnetic Resonance

Neurography*, 341 Lancet 659, 661 (March 13, 1993) (Ex. 2).[2]

In November 2007 and February 2008, most of these funding entities assigned their rights

to the patent to St. George's, which assignments purported to be retroactive to February 1, 1992.

*See* Exs. 15-17.  There is no evidence, however, that the NIH or GE Medical Systems assigned

any of their rights in the '360 patent to UW, St. George's, or any other entity.  Accordingly, the

---

[2]  Dr. Filler has stated that this *Lancet* article is one of the initial reports concerning the supposed
inventions disclosed in the '360 patent, and it was published a few days after the named
inventors filed the '360 patent application.  *See* A.G. Filler et al., *The History, Development and
Impact of Computed Imaging in Neurological Diagnosis and Neurosurgery: CT, MRI, and DTI*
(2009), at 44 (Ex. 11).  The *Lancet* article includes several of the images that were used as
figures in the '360 patent.  *Compare* Ex. 2 at 660 *with* Ex. 1 ('360 patent), Figs. 20-22.

NIH and GE Medical Systems may still retain rights in the patent.

### 3.   In March 1994, UW and WRF Executed an "Exclusive Technology License."

On March 23, 1994, UW and WRF entered into what they termed an "Exclusive Technology License" (hereafter, the "UW-WRF License").  Ex. 7 (UW-WRF License) at 1.  By this agreement, WRF received ███████████████████████████████████ ███████████████, *id.* § 2.01, which was defined to include patent rights ████████ ██████████████████████████████████████████" *Id.* § 1.02.

### 4.   In May 1994, UW, WRF, and St. George's Executed a Technology Administration Agreement.

About two months after UW and WRF executed the Exclusive License Agreement, in May 1994, UW, WRF, and St. George's entered into a "Technology Administration Agreement" (hereinafter, the "TAA").  Under the TAA, St. George's "agree[d] to assign" patent rights to UW.  Ex. 8 (TAA) § 2.1.  Also, the TAA stated that UW "agree[d] to exclusively license" to WRF its patent rights, including those it would receive from St. George's.  *Id.* § 2.2.  The TAA does not state or suggest that the TAA actually effectuated such a license.  Indeed, the TAA provides that "████████████████████████████████████████████ ██████████ *Id.*

By its terms, however, the TAA's effective date was May 31, 1994, "the date of the last party to sign" the agreement, *id.* at 2, 7, and it ████████████████████████████ ████████████████████████████████████████ the rights in the purported invention of Drs. Filler, Tsuruda, Richards, and Howe.  *Id.* § 10.1.

It was not until 2008, after St. George's had received assignments from the UK Trusts, that St. George's finally assigned its patent rights to UW.  *See* Ex. 9 (St. George's-UW Assignment) at 4.  That 2008 assignment purported to be retroactive and "effective as of 31 May, 1994," i.e., the

date St. George's executed the TAA and two months after the UW-WRF License was executed. *Id.* at 2. There is no evidence that UW and WRF entered into any license agreement on or after May 31, 1994.

This apparent break in the chain of title has been briefed by various defendants in this MDL in previous motions to dismiss. Apparently unable to locate the Exhibit A or an agreement between UW and WRF executed after the TAA, Plaintiffs have responded with a 2013 declaration by WRF's John Reagh, who testifies to events that allegedly happened in March 1994, along with letters and drafts of agreements purporting to be from that same time period. As discussed below, Plaintiffs' newly-submitted evidence, most of which is inadmissible, does not respond to most of Defendants' arguments, yet Plaintiffs continue to assert that they still "have standing to bring this action." Ex. 19 (*University of Chicago* case, Plaintiffs' Opposition to Defendants' Motion to Dismiss Under Rules 12(b)(1) and 12(b)(7)) at 13.[3]

### 5.   **In 1998, WRF and NeuroGrafix Executed an Exclusive License Agreement.**

In December 1998 – ten years before St. George's belated assignment, and four years after the UW-WRF License and TAA were executed – WRF and NeuroGrafix executed an "Exclusive License Agreement," by which WRF purported to grant NeuroGrafix "exclusive rights to make, use, and sell Licensed Products" that ███████████████████ ████████████████████████████████████████████████ Ex. 10 (WRF-NeuroGrafix 1998 License) § 2; *see id.* § 1.7, Appx. A (identifying rights in the '360 patent as part of the "Patent Rights").

---

[3] Plaintiffs have filed over fifteen lawsuits seeking to enforce the '360 patent. In many of them, defendants have filed motions like this one challenging Plaintiffs' standing. Plaintiffs' opposition brief in the *University of Chicago* case, the latest response by Plaintiffs to the standing motions, is cited herein as representative of Plaintiffs' current positions.

6.  **In 2011, NeuroGrafix, NIMA, and IBSC Divided NeuroGrafix's Alleged Patent Rights Among Themselves.**

In September 2011, Plaintiffs entered into two "Exclusive License Agreements" – one between NeuroGrafix and NIMA and another between NIMA and IBSC.  Through the NeuroGrafix-NIMA License, NeuroGrafix purportedly granted NIMA "an exclusive license to make, have made, use, import, sell, offer to sell, and have sold Licensed Products under the Patent Rights," Ex. 13 (NeuroGrafix-NIMA Agreement) § 2.1, which includes NeuroGrafix's rights in the '360 patent. *Id.* § 1.8, Appx. A.  NeuroGrafix retained "the exclusive right to sue for any infringement by Third Parties."  *Id.* § 6.2.  Through that same license, NIMA purported to grant back an "exclusive license to make, have made, use, import, sell, offer to sell, and have sold Licensed Products under the Patent Rights in the field of use of non-human medicine."  *Id.* § 3.1.

Through the separate NIMA-IBSC License, NIMA purported to grant "an exclusive license to make, have made, use, import, sell, offer to sell, and have sold Licensed Products under the Patent Rights" limited to "any use in surgical procedures."  Ex. 14 (NIMA-IBSC Agreement) §§ 1.10, 2.1, 2.2.  Each of NIMA and IBSC has the right to further sublicense their rights, subject to NeuroGrafix's approval, Ex. 13 § 2.1; Ex. 14 § 2.1, but neither retained the right to sue for infringement.  Ex. 13 § 6.2; Ex. 14 § 6.2.

7.  **In June 2012, WRF and NeuroGrafix Executed an "Amended and Restated Non-Terminable Exclusive License Agreement."**

On June 15, 2012, before Plaintiffs launched this wave of infringement cases, WRF and NeuroGrafix entered into an amended and restated licensing agreement ("the Amended Agreement"), which the Plaintiffs have alleged conveyed to NeuroGrafix substantially all rights in the '360 patent.  Ex. 12.  The Amended Agreement purports to grant NeuroGrafix "exclusive and non-terminable rights to make, use, and sell Licensed Products in the Territory, ██ using

substantially similar language as that used in the 1998 WRF-NeuroGrafix Exclusive License

Agreement and references an "Appendix A."  Appendix A, however, is not attached to the

Amended Agreement, and Plaintiffs have failed to produce it, even after being ordered by the

Court of Federal Claims to do so in a related case in which Plaintiffs have accused the U.S.

Government of infringement.[4]  Ex. 23.

The Amended Agreement does not grant to NeuroGrafix the exclusive right to import or

offer for sale products or services relating to the '360 patent, which are two of the five

exclusionary rights given to a patent owner under 35 U.S.C. § 154(a)(1).  Indeed, the agreement

purports to grant to NeuroGrafix only the exclusive rights "to make, use and sell Licensed

Products in the Territory . . . ."

Additionally, by the Amended Agreement, 

*Id.* §§ 3, 4.  NeuroGrafix is obligated to

*Id.* §§ 4, 5.

## III.  LEGAL STANDARD

Plaintiffs have the burden to establish that this Court has jurisdiction over the subject

matter, including by demonstrating that they have standing.  *See Lujan v. Defenders of Wildlife*,

---

[4] The Court of Federal Claims action was not centralized as part of this MDL.  The
Government's motion to dismiss for lack of standing is still pending before that court.  *See
NeuroGrafix v. United States*, C.A. No. 12-00385 (C.F.C.) (Damich, J.).

504 U.S. 555, 561 (1992) (holding that plaintiffs must establish each of the elements of subject matter jurisdiction as part of their case).  Because Plaintiffs assert that they have standing to enforce the '360 patent not as the patentee or owner, but as licensees, it is their burden to provide evidence that they have sufficient rights in the patent to do so.  *See Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001).  This Court is empowered to consider evidence outside the pleadings in deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).[5]  *See Torres-Negrón v. J & N Records, LLC*, 504 F.3d 151, 163 (1st Cir. 2007) ("[T]he trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.") (internal quotation marks omitted).

When analyzing standing in patent cases, courts generally consider into which of three categories a plaintiff may fit: "those that can sue in their own name alone; those that can sue as long as the patent owner is joined in the suit; and those that cannot even participate as a party to an infringement suit."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007).

The first category consists of patentees and exclusive licensees that have received "all substantial rights" in the patent, the latter of which "amounts to an assignment or transfer of title."  *Id.* at 1340.  A "patentee" includes the person or persons to whom the patent issued and the assignees of the patent rights.  *See, e.g., Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007).  This includes not only assignees of the entire patent, but assignees

---

[5]  The Federal Circuit has held that the question of whether a licensee has an exclusive license with all substantial rights in the patent, and, therefore, prudential standing, is ultimately a question concerning the court's jurisdiction.  *See Mentor H/S*, 240 F.3d at 1018.  Thus, the prudential standing issues presented in this motion are properly addressed under the Rule 12(b)(1) standard, rather than under Rule 12(b)(6).  However, even if the Court were to consider the prudential standing issue under Rule 12(b)(6), dismissal would still be appropriate in view of the evidence here, which the Court may rely on for the purposes of Rule 12(b)(6).  *See Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 86 (1st Cir. 2008).

of the entire patent right within a given geographic territory of the United States and assignees of "an undivided part or share of that exclusive right." *Id.* In the case of co-owners of undivided parts, however, one "joint owner must join all the other co-owners to establish standing." *Id.*

The second category consists of exclusive licensees with less than all substantial rights. *Morrow*, 499 F.3d at 1340. To satisfy prudential standing requirements, the owner of the legal title to the patent must be joined as a plaintiff. *Id.*

The third category consists of non-exclusive licensees, who cannot suffer a legal injury because they lack exclusionary rights under the patent. *Id.* Without a legal injury, non-exclusive licensees do not have constitutional standing to sue for infringement and cannot sue even if the patent owner is joined as a co-plaintiff. *Id.* at 1341.

## IV.  ARGUMENT

Plaintiffs allege that UW owns the '360 patent. For Plaintiffs to thus have standing to sue on the '360 patent without joining UW, they must prove that UW has transferred all substantial rights in the patent <u>and</u> that they have received all substantial rights. Plaintiffs fail on both counts.

### A.  The University of Washington Still Holds Substantial Rights in the '360 Patent and Must Be a Plaintiff in These Actions.

#### 1.  The UW-WRF License Did Not Transfer Any Rights in the '360 Patent to WRF  Because the UW-WRF License Was Superseded by the TAA.

The UW-WRF License was superseded by the Technology Administration Agreement (TAA) executed two months later, on May 31, 1994, and made null and void prior to WRF granting rights to NeuroGrafix. More specifically, TAA ███████████████████ ███████████████████████████████████████ Ex. 8 § 10.1. The UW-WRF License was dated March 23, 1994, Ex. 7 at 1, making it a prior agreement, and it relates to the same technology as the TAA, which references the International counterpart application to the '360

patent, PCT/US93/02036.  Ex. 8 §§ 1.1, 1.2.

The parties to the TAA ████████████████████████████████████

According to the TAA, St. George's promised to assign its rights to UW, Ex. 8 § 2.1, and UW

promised to exclusively license these and its own rights to WRF by an instrument ████

████████████████████████████████████"[6]  *Id.* § 2.2.  By UW agreeing to

subsequently license rights not yet assigned by St. George's and by including as an exhibit the

form of a license to be used, the parties to the TAA manifested in the express provisions of that

agreement ██████████████████████████████████████████████████

████████████████████

Since May 31, 1994, there has been no subsequent license between UW and WRF.  As a

result, WRF's rights in the '360 patent expired when the TAA was signed effective on that day,

and UW therefore retained all its rights in the '360 patent.

          a.    **Plaintiffs' Extrinsic Evidence of UW's, WRF's, and St. George's Intent Cannot Contradict the TAA's Unambiguous Language.**

In an attempt to address this break in the chain caused nearly twenty years earlier by the

1994 TAA, Plaintiffs have relied upon a 2013 declaration by WRF's John Reagh ("Reagh

Declaration"), which purports to establish that the UW-WRF License was not a "previous

understanding[] and obligation[]" that should be properly viewed (and rejected) under the

superseding clause, but rather that UW, WRF, and St. George's "intended to execute the [TAA]

and the UW-WRF License contemporaneously."  Ex. 19 (Opp. to Mot. to Dismiss in *University*

*of Chicago*) at 6.  But under Washington law, which presumably governs the UW-WRF License

_____

[6]  The executed TAA produced by Plaintiffs to the Defendants did not include an Exhibit A, but
Plaintiffs, after first suggesting that this language might be a typographical error, have
subsequently contended that the draft agreement attached to the March 9, 1994 letter (Ex. 20) is
what Exhibit A was supposed to be.

and the TAA, "extrinsic evidence of the parties' intent is generally not admissible to contradict the terms of a written agreement." *In re Marriage of Schweitzer*, 937 P.2d 1062, 1066 (Wash. 1997). Plaintiffs' evidence therefore cannot be considered to the extent that it contradicts the TAA's operative and explicit language concerning its superseding of the UW-WRF License.

> b. **Plaintiffs' Extrinsic Evidence Does Not Reveal St. George's Intent.**

Plaintiffs' extrinsic evidence does not bear on St. George's intent, Mr. Reagh could not have personal knowledge about St. George's intent, and Plaintiffs' supposed evidence is, at best, mere hearsay in that regard. Furthermore, there is no evidence that St. George's was involved in the decision between UW and WRF to enter into a side license prior to the execution of the TAA. *See* Ex. 21 (Reagh Decl.) ¶ 4; Ex. 22 (March 22, 1994 letter from WRF to UW, not copied to St. George's).

Plaintiffs have previously asserted that UW, WRF, and St. George's "intended for the TAA to establish the foundation for the UW-WRF License, not terminate the UW-WRF License." Ex. 19 (Opp. to Mot. to Dismiss in *University of Chicago*) at 5. But even assuming that this were true, the evidence Plaintiffs proffered shows that UW and WRF frustrated such "intent" by entering into the UW-WRF License early, and essentially behind St. George's back. Furthermore, in contrast to Plaintiffs' previous argument that "UW, St. George's and WRF intended to enter into an agreement that consisted of two parts," *id.*, the letters Mr. Reagh attached to his declaration actually show a three-part serial arrangement, consisting of all three entities executing the TAA, then having St. George's assign its rights to UW, and then having UW exclusively license WRF. Indeed, the March 9, 1994 letter from Mr. Reagh to Mr. Hill of St. George's states that the provisions of the TAA call for a serial process of assignment of rights such that St. George's assignment to UW would precede the UW license to WRF:

███████████████████████████████

████████████████████████████████████████

Ex. 20 at 1 (emphasis added).

There is no evidence whatsoever that St. George's even knew that UW had already licensed its rights to WRF when the parties executed the TAA two months later. And although Mr. Reagh testified that St. George's was "amenable to the terms of the draft TAA and UW-WRF License," which Plaintiffs call "nearly identical to the draft UW-WRF License that was approved by St. George's on March 17, 1994," Ex. 19 at 6, Mr. Reagh makes no statement as to whether St. George's was amenable to one of the most important terms in the executed UW-WRF License, *i.e.*, the date of execution. In other words, even if Mr. Reagh is correct that St. George's agreed to the form of the UW-WRF License on March 17, 1994, there is no evidence that St. George's agreed that the UW-WRF License would be entered into before St. George's signed the TAA or assigned its rights in the '360 patent to UW.

> ### 2. The Rights St. George's Assigned to UW Were Not Licensed to WRF, So UW Still Holds Rights in the Patent.

Even if one were to assume that the UW-WRF License somehow survived the TAA, UW could have granted to WRF only the rights that UW had received at the time of that license by way of the assignments from Drs. Filler, Tsuruda, and Richards. As mentioned above, Dr. Howe had assigned his rights to St. George's, and Dr. Filler had assigned part of his rights to St. George's as well. Although in 2008 St. George's purported to retroactively assign its rights to UW with an effective date of May 31, 1994, i.e., the date of the TAA, the UW-WRF License was executed two months prior in March 1994 and, therefore, even if this retroactive assignment were effective, it would not have assigned St. George's rights far back enough for them to be transferred by virtue of the March 1994 UW-WRF License. In other words, UW did not have St. George's rights at the time that the UW-WRF License was executed and that License's statement

that UW was granting UW's rights to WRF could not have included the rights UW subsequently obtained from St. George's.

Plaintiffs are not saved by the language in the UW-WRF License that states that the license granted to WRF includes ████████████████████████████████████████ ████████████████ *Id.* § 1.02 (emphasis added). ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.* (emphasis added).  St. George's is not

████████████████████████████████████ *Id.* § 1.01.  So, even if this sort of license

to rights not yet acquired could be effective, the License here explicitly limits its scope to ████████

████████████████████████████ This argument thus does not divest UW of the rights it

owned in the '360 patent as of May 31, 1994.

   3.   **UW Still Has a Right to Sue for Infringement Under the UW-WRF License.**

Under the UW-WRF License, UW retained ████████████████████████ UW thus did

not transfer all substantial rights to the '360 patent and is, at the very least, required to be joined

as a plaintiff.  *See Alfred E. Mann Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d

1354, 1361 (Fed. Cir. 2010) (recognizing that "the nature and scope of the licensor's retained

right to sue accused infringers is the most important factor in" deciding whether the licensor

retains substantial rights).

Section 10.01 of the UW-WRF License, ████████████████████████████████

████████████████████████████████████





Ex. 7 (UW-WRF License) § 10.01.  But nothing in the UW-WRF License itself expressly ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Indeed, Section 10.01 does not

restrict UW itself from bringing an infringement action against a third-party infringer.  *See*

*Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1342 (Fed. Cir. 2011)

("Nothing in the license curtails the USDA's right as a patentee to sue on the patent.  And the

USDA is at liberty to decline to enforce the patent.").  To be sure, Section 10.01 of the License

provides WRF with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮  Ex. 7 (UW-WRF License) § 10.01.  The

license, however, conspicuously omits any language restricting ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The

license language expressly contemplates ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮  *Id.*

Therefore, because UW has retained an unconditional right to sue, UW is at least a

necessary party to a lawsuit regarding the '360 patent, and its absence from these suits requires

their dismissal.

**B.    Even If UW is Not a Necessary Party, WRF Retains Substantial Rights in the '360 Patent.**

**1.    WRF Did Not Transfer to NeuroGrafix the Exclusive Rights to Import and Offer to Sell.**

Even if the Court were to find that UW granted WRF an exclusive license with all

substantial rights to the '360 patent, Plaintiffs still would still lack prudential standing to sue,

generally, and would lack constitutional standing to sue for any allegedly infringing offers for

sale and importation.

By its express terms, the Amended Agreement between WRF and NeuroGrafix grants NeuroGrafix the rights only "to make, use, and sell Licensed Products."  Ex. 12 § 2.  These rights are just three of the five exclusive rights enjoyed by a patent owner under 35 U.S.C. § 154(a)(1), which also includes the rights to import into the United States and to offer to sell in the United States.[7]

By failing to convey all exclusive rights under the patent, the rights to exclude others from infringing on the patent monopoly, WRF failed to convey all substantial rights.  *See Waterman v. MacKenzie*, 138 U.S. 252, 257 (1891) (holding, at a time when the patent law afforded only the exclusive rights to make, use and sell, that a licensee with the rights to manufacture and sell, but not the right to use, the patented invention did not have all substantial rights).  In *Waterman*, the plaintiff received by agreement "the sole and exclusive right and license to manufacture and sell fountain penholders containing the said patented improvement throughout the United States."  *Id.*  Even though the Court assumed that this could be read to imply a right to use penholders manufactured pursuant to the license, it "did not include the right to use such penholders, . . . if manufactured by third persons."  *Id.*  This omission rendered the agreement a "mere license," and the licensee had no "right to sue alone, at law or in equity, for an infringement of the patent."  *Id.*

Even assuming, as the Court did in *Waterman*, that Plaintiffs here have limited rights to import or offer to sell "Licensed Products" made pursuant to the Amended Agreement, the

---

[7]  The relevant text of 35 U.S.C. § 154(a)(1) is as follows:

> Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process . . . .

license still does not convey all substantial rights. For instance, NeuroGrafix received no right to import patented devices manufactured by third parties in jurisdictions where the '360 patent has no foreign counterpart. The owner of the importation right under the '360 patent (UW and/or WRF, for reasons discussed above) therefore has authority to import or license a third party to import those products into the United States without seeking any permission from NeuroGrafix or its sublicensees. This is one of the statutory exclusive rights to which none of the plaintiffs has any claim of ownership, and therefore Plaintiffs cannot hold all substantial rights in the '360 patent. Because WRF and/or UW holds the rights to import and offer for sale, NeuroGrafix, NIMA, and IBSC lack prudential standing to sue without one or both them.

Moreover, Plaintiffs do not have constitutional standing to sue for alleged acts of "offering to sell, or importing" infringing products or services because the Plaintiffs never received those exclusive rights under the Amended Agreement. Without those exclusive rights, Plaintiffs cannot have suffered any legal injury from the defendants' alleged offers to sell or importation of infringing products or services. *See WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264-65 (Fed. Cir. 2010) ("[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause injury to the party holding the exclusionary right to suffer legal injury."); *Amgen, Inc. v. Chugai Pharm. Co.*, 808 F. Supp. 894 (D. Mass. 1992) ("[I]t is not enough that Ortho-Amgen agreements grant Ortho certain exclusive rights. It is also necessary that the infringement have occurred within Ortho's 'stated area of exclusivity.'"), *aff'd*, 52 F.3d 1026 (Fed. Cir. 1995); *see also Morrow*, 499 F.3d at 1339-1340 (licensee having exclusionary right listed in 271(a) constitutionally injured when another performs an act that violates that right). For this reason, Plaintiffs' infringement claims should be dismissed to the extent they are

based on alleged offers to sell or importation of infringing products and services.

  a.  **Plaintiffs Misplace Their Reliance on the Recitals to the Amended Agreement to Create a Grant of the Exclusive Right to Offer For Sale and Import**

  To overcome this glaring omission in the rights granted under the Amended Agreement, Plaintiffs have previously relied upon Recital F to the agreement, which states that the "objective of this Amendment is to remove WRF as a necessary party to actions where Licensee asserts the Patent Rights against Third Party infringers and related actions."  Ex. 12 at 1.  Plaintiffs have suggested that this language should be used to fill in gaps and be used to supply missing grant language.  But the grant language is not ambiguous, Plaintiffs have never suggested any such ambiguity in their previous briefing, and, under Washington law, which explicitly governs the agreement, Ex. 12 § 21, recitals "do not constitute a promise or condition which would amount to a contractual element of the agreement."  *N. State Const. Co. v. Robbins*, 457 P.2d 187, 192 (Wash. 1969).  Recitals may be used to aid in the construction of the terms of an agreement "only when and if [the terms] are unclear."  *Rains v. Walby*, 537 P.2d 833, 836 (Wash. App. Ct. 1975); *see Grey v. Leach*, 244 P.3d 970, 975 (Wash. Ct. App. 2010) ("Clear and unambiguous contracts are enforced as written.").

  The grant provision of the Amended Agreement cannot be ambiguous because it is not "fairly susceptible to two different interpretations, both of which are reasonable."  *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1004 (Wash. 1992).  The provision mentions only the rights to "make, use, and sell Licensed Products," and says nothing about offering to sell or importing Licensed Products. Ex. 12 § 2.1.  There is no reasonable interpretation of this language by which exclusive patent rights not listed would be included in the grant. NeuroGrafix's own agreement with NIMA provides an excellent counter-example.  The NeuroGrafix-NIMA License executed in 2011 purports to grant "an exclusive license to make,

have made, use, import, sell, offer to sell, and have sold Licensed Products." Ex.13 § 2.1.  By asserting that it received all substantial rights, NeuroGrafix is effectively asking this Court to construe "make, use, and sell" to have the same meaning as "make, have made, use, import, sell, offer to sell, and have sold."  There is no justification for doing so under the law governing the contract.

In fact, this difference between the 2011 NeuroGrafix-NIMA License and the 2012 Amended Agreement shows that NeuroGrafix knew how to draft a grant that conveyed the exclusive rights to import and offer to sell.  And NeuroGrafix was already aware that it had attempted to transfer those exclusive rights to NIMA prior to the date of the Amended Agreement.  Nevertheless, the grant from WRF to NeuroGrafix omitted the exclusive rights to import and offer to sell, which is incompatible with NeuroGrafix or one of its licensees having all substantial rights.  Therefore, at best, Plaintiffs would need to add a party whose presence as a plaintiff would rectify the prudential standing issue.

> b. **Plaintiffs Have Mischaracterized The *Aspex* And *Dexas* Cases As Holding That The Exclusive Rights To Offer For Sale And Import Are Immaterial**

Plaintiffs have tried to address this lack of transfer of all rights to NeuroGrafix, but their arguments fall short.  Plaintiffs have cited *Dexas Int'l, Ltd. v. Tung Yung Int'l (USA) Inc.*, No. 6:07-cv-334, 2009 U.S. Dist. LEXIS 34766 (E.D. Tex. Feb. 25, 2009), and *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336 (Fed. Cir. 2006), as holding that the failure to obtain the two statutory exclusive rights Plaintiffs failed to obtain was immaterial.  Those cases did no such thing.

In *Aspex Eyewear*, the district court had found that the plaintiff, Contour, lacked standing to sue on the basis of a license by Contour to a non-party that the district court found to be an assignment of all substantial rights.  434 F.3d at 1339.  The Federal Circuit vacated the district court's decision and found that Contour maintained standing because it had not transferred all

substantial rights.  *Id.* at 1343.  Although the Federal Circuit mentioned in passing that a conveyance of the exclusive rights to "make, use, and sell, . . . often associated with ownership of a patent . . . favor[ed] a finding of an assignment," this was not related to the holding.[8]  *Id.* at 1342.  Moreover, the court never addressed whether the *absence* of the rights to import and offer to sell might affect this conclusion, because the court based its decision on entirely unrelated grounds, holding that the license did not grant all substantial rights because the license had a fixed term of years that expired long before the patent did.  *Id.* at 1343.

As for *Dexas*, that court did not find that the exclusive rights to offer for sale or import were unnecessary, but found that, under Texas law, the agreement at issue actually conveyed all exclusionary rights, including the rights to offer for sale and import.  2009 U.S. Dist. LEXIS 34766, at *19, *26-27.  The agreement at issue in *Dexas* granted "an exclusive license to manufacture and distribute the patented products."  *Id.* at *20 (emphasis added).  Of course, this license did not expressly recite the rights to offer for sale and import, *id.* at *13-14, but it also did not expressly recite any of the rights enumerated in the Patent Act.  *Id.* at *21.  The *Dexas* court rejected the argument that the failure to expressly name the statutory "offer to sell" and "import" rights meant those rights were excluded.  *Id.* at *17, *21-22.  The reason, however, was that none of the statutory rights was listed, so juxtaposing the agreement's grant language with the Patent Act was not appropriate, and the failure to expressly name these two rights was not significant.  *Id.* at *20-22.[9]

---

[8] Moreover, the *Aspex* court was merely quoting from the Supreme Court's *Waterman* decision, which issued well before the Patent Act was amended to include the exclusive rights to offer for sale and import.

[9]  To the extent the court in *Dexas* suggests that the absence of the importation right did not affect the outcome of its decision, the court relied on the same incorrect reading of *Aspex* that Plaintiffs urge here, and did not consider the Supreme Court's decision in *Waterman*.  *See* 2009 U.S. Dist. LEXIS 34766, at *22-24.

By contrast, in this case, three statutory rights are listed and two are absent.  Under Washington law, a contract that expressly grants certain rights effectively excludes similar, unlisted rights.  *See Port Blakely Mill Co. v. Springfield Fire & Marine Ins. Co.*, 110 P. 36, 40-41 (Wash. 1910) (holding a contract, which was expressly voidable under certain conditions, could not be avoided because the representation at issue did not include a provision for voiding the contract).  The omitted rights are therefore excluded from the scope of the Amended WRF-NeuroGrafix Agreement.  If WRF and NeuroGrafix intended to convey these rights, they could have easily done so.  Indeed, NeuroGrafix was aware of the statutory language.  In its license with NIMA, for example, it expressly listed all five of the exclusionary rights.  Ex. 13 § 2.1.

Neither *Aspex* nor *Dexas*, nor any other case of which Defendants are aware, has held that a patent infringement plaintiff had standing to sue in its own name without having received all of the exclusive rights under the Patent Act.  On the other hand, the Supreme Court's decision in *Waterman v. MacKenzie*, 138 U.S. 252, 257 (1891), directly supports the proposition that one cannot be an effective assignee – *i.e.*, have all substantial rights – unless one at least has all exclusive rights.

      c.    **Plaintiffs' Argument That the Right to Exclude Third Parties From Selling Includes the Right to Exclude Third Parties from Offering to Sell is Incorrect.**

Plaintiffs also have previously argued that the right to offer to sell is implicit in the right to sell, so WRF did not need to explicitly transfer that right.  But the focus under *Waterman* is not on whether the <u>licensee</u> might have been given the contractual right so that the <u>licensee</u> may make offers for sale, where it might be appropriate to find that a contractual right to sell implies a right to offer for sale.  Rather, the focus under *Waterman* is on whether the licensee has been granted the patentee's right under the Patent Act to exclude others from making offers for sale.  The exclusionary rights to sell and offer for sale are listed separately in the Patent Act, and statutory

redundancy should not be presumed.  *See Corley v. United States*, 556 U.S. 303, 304 (2009).

In any event, even if a grant of an exclusive right to sell could imply a grant of an exclusive right to offer for sale, Plaintiffs have made no analogous argument regarding their lack of the exclusive right to import, which cannot be read into or implied in the Amended Agreement.

> d.   **Plaintiffs' Argument That NeuroGrafix's Purported Grant of Exclusive Rights to Offer for Sale and Import to NIMA Implies That NeuroGrafix Received Those Rights From WRF is Nonsensical.**

Plaintiffs have also erroneously argued that the fact that NeuroGrafix purported to grant NIMA the exclusive rights to offer to sell and import means that NeuroGrafix received those rights from WRF.  But this turns on its head the hornbook principle that one cannot grant what one does not have.  *See Fieldturf, Inc. v. Southwest Rec. Indus.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004) (holding that an agreement's silence on important rights meant the agreement "fail[ed] to convey all substantial interest in the . . . patent").  In fact, what the rights to offer to sell and import in the 2011 NeuroGrafix-NIMA agreement mean is that the parties knew how to grant those rights in 2012 when they amended the WRF-NeuroGrafix agreement, but they deliberately decided not to have WRF grant such rights to NeuroGrafix.

For these reasons, to the extent WRF received any rights in the '360 patent, it retained substantial rights such that it is a necessary party.

> 2.   **The Amended Agreement Does Not Grant NeuroGrafix All Rights to Sue.**

Although WRF and NeuroGrafix entered into the Amended agreement in 2012 supposedly to cure defects in the original 1998 agreement regarding NeuroGrafix's right and ability to sue, NeuroGrafix was still not granted the right to sue all infringers.  In the Amended Agreement, NeuroGrafix was granted the right to sue Third Parties.  Ex. 12. § 7.2.  But the definition of Third Party, which includes only "any individual, corporation, partnership or other business entity other than WRF, Licensee, Affiliates and Sublicensees," *id.* § 1.5, excludes "WRF, . . . Affiliates and

Sublicensees" or governmental entities,[10] so NeuroGrafix does not have an absolute right to sue anyone, thus diminishing NeuroGrafix's purported exclusive rights.

> 3. **The Amended Agreement Between WRF and NeuroGrafix Does Not Include Rights to the '360 Patent**

The Amended Agreement between WRF and NeuroGrafix, which is the supposed source of NeuroGrafix's right to the patent and, in turn, its licensees, NIMA and IBSC, also does not confer standing since the Amended Agreement nowhere mentions that it covers the '360 patent. The Agreement licenses "Patent Rights," which are defined as "WRF's rights to granted and pending claims for those patents listed in Appendix A," *id.* § 1.7, but Plaintiffs have never produced Appendix A to confirm the patents that are listed there. In Plaintiffs' case pending against the U.S. Government in the Court of Federal Claims, that court ordered Plaintiffs to produce such an Appendix, s*ee* Ex. 23. To date, Plaintiffs have failed to produce Appendix A to the Amended Agreement. Because Plaintiffs have not demonstrated that the Amended Agreement covers the '360 patent, none of the three plaintiffs can show that have any rights to the patent and that they have constitutional standing.

> 4. **The Amended Agreement is Designed to Protect WRF's Financial Interests.**

Furthermore, the Amended Agreement between WRF and NeuroGrafix contains several provisions designed to protect the WRF's pecuniary interests in the '360 patent. *See Propat Int'l Corp. v. RPost US, Inc*., 473 F.3d 1187, 1191 (Fed. Cir. 2007) (licensor's retention of equity interest in proceeds of licensing and litigation activities weighed in favor of determination that licensor did not transfer all substantial rights in asserted patent); *E8 Pharms. LLC v. Affymetrix, Inc*., 680 F. Supp. 2d 292, 299 (D. Mass. 2010) (licensor's right to 20% of litigation proceeds consistent with continued ownership). The Amended Agreement provides that:

---

[10] The United States and other governmental entities do not qualify as an "individual, corporation, partnership or other business entity"; they are non-commercial entities, like that recognized in *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 974 (Fed. Cir. 2005).



Collectively these provisions show that WRF did not grant to NeuroGrafix the right to do whatever it pleased with its rights to the '360 patent.  Despite the parties' supposed intent to preclude WRF from being deemed a necessary party, WRF was unwilling or unable to part with significant rights that do just that.

     5.    **The Amended Agreement is Subject to the Restrictions on WRF's Rights Under its Agreements With the University of Washington and St. George's.**

Additionally, because the Amended Agreement purports to convey to NeuroGrafix certain of WRF's rights to the patent, these rights would be subject to the same restrictions and limitations as WRF's rights, *i.e.*, they would flow through because WRF could not convey more rights than it actually had.  Accordingly, the limitations and reservations of rights regarding licensing under the UW-WRF License and/or the TAA are relevant here.  Specifically, the Amended Agreement does not eliminate the limitations and reservations in the UW-WRF License and the TAA, which provides that the rights conveyed are subject to the Bayh-Dole Act, 35 U.S.C. §§ 200-212, and its implementing regulations, 37 C.F.R. §§ 401.1-.17.  Ex. 7 (UW-WRF License) § 3.02; Ex. 8 (TAA) § 5.1.  Under the Bayh-Doyle Act, which concerns patents resulting from federally-funded research, patent rights (1) may not be assigned without approval of the sponsoring federal agency, such as the NIH; (2) may be retained by the federal government; and (3) are subject to the federal government's "march-in" rights to force a compulsory license under certain circumstances.  *See* 35 U.S.C. §§ 202-203.  Although not expressly mentioned in the Amended Agreement between WRF and NeuroGrafix, these

limitations on WRF in the UW-WRF License and the TAA would also apply to the later grant

from WRF to NeuroGrafix, and affect the scope of NeuroGrafix's rights.

Furthermore, UW and St. George's  *Id.* § 5.1.  Finally, the

agreement allows *Id.* § 8.2.

### C.   Plaintiffs' Divided Rights Deprive Them of Constitutional Standing Because No Plaintiff Has an Injury-In-Fact nor the Power to Sue on Behalf of the Others.

Even if the Amended Agreement is deemed to cover the '360 patent and even if

NeuroGrafix had received all substantial rights in the patents, none of the plaintiffs has

constitutional standing to sue, so these suits should still be dismissed.  NeuroGrafix granted an

exclusive license to NIMA, retaining no rights other than the right to sue.  NIMA purportedly

sublicensed exclusive rights back to NeuroGrafix and NIMA within specific fields of use.  Each

of the three plaintiffs has the right to sell a device capable of being used in any of the fields of

use, however, and anyone who purchases that device can, under the doctrine of patent

exhaustion, use it in any way without infringing the '360 patent.  The purported exclusivity is

therefore illusory because none of the three Plaintiffs can effectively exclude others from its

respective field of use.  As a result, the transfers between the plaintiffs severed the right to sue

from any exclusive rights to practice the invention, divesting plaintiffs of constitutional standing.

### 1.   The Purported Exclusivity of the Sublicenses to NeuroGrafix and IBSC is Illusory.

Although they purportedly have exclusive field-of-use licenses, neither NeuroGrafix nor

IBSC has obtained the right to exclusivity, even within their field of use, because third parties

can lawfully practice the '360 patent within those fields of use without the permission of the

purportedly exclusive licensee.  The NIMA-IBSC License purports to give IBSC an exclusive license to "make, have made, use, import, sell, offer to sell, and have sold Licensed Products under the Patent Rights" for "any use in surgical procedures."  Ex. 14 §§ 1.10, 2.1.  NeuroGrafix transferred all of its exclusive rights in the '360 patent to NIMA, except the right to sue and control litigation, receiving a purportedly exclusive sub-license for non-human medicine uses of the patent.  Ex. 13 § 3.1.  But because NIMA purportedly has the right "to make, have made, use, import, sell, offer to sell, and have sold Licensed Products under the Patent Rights," *id.* § 2.1, it can make or have made devices for, e.g., "diffusion tensor imaging and diffusion anisotropy based tractography," *Philips* Compl. [12-cv-11065 Dkt. No. 1] ¶ 21, and sell those devices to whoever will buy them.

NIMA and IBSC both have the right to sell devices designed to obtain images of structures within human subjects.  These can be used for either surgical or non-surgical procedures and would be capable of obtaining images in at least some non-human mammalian subjects, as well, such as primates.  And NeuroGrafix has the right to sell the same devices because of their capability for non-human use.

Since any of the three plaintiffs has the right to effectively compete within the field of use allocated to the other two without causing any infringement.  "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).  Furthermore, "method patents [are] exhausted by the sale of an item that embodie[s] the method."  *Id.* at 629.  The purchase of a patented machine – in these cases, MRI machines programmed to perform diffusion tensor imaging – "carries with it the right to the use of that machine so long as it is capable of use."  *Id.* at 625.

Since Plaintiffs have no right to stop one another from interfering in their respective fields of use, the fields of use licensed by NIMA to NeuroGrafix and IBSC are not actually exclusive, and neither of those two latter entities has constitutional standing.  *See Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193-94 (Fed. Cir. 2007) (licensees without exclusive rights lack standing, even when the patent owner is also joined).  Moreover, because NeuroGrafix has the exclusive right to sue or settle with any Third Party accused of infringement, Ex. 13 § 6.2; Ex. 14 § 6.2, and NIMA and IBSC have no such right, NeuroGrafix could effectively grant licenses outside its field of exclusivity, again rendering NIMA's and IBSC's "exclusive" field-of-use rights illusory.

### 2.   IBSC is a Bare Licensee With No Standing Whatsoever.

Because the purported exclusivity of its license is illusory, IBSC has suffered no legal injury and does not have constitutional standing.  "It is well-settled that non-exclusive licensees do not have constitutional standing to sue."  *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202-03 (Fed. Cir. 2005) (citing *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed.Cir.2001)).  IBSC therefore cannot be a plaintiff to these actions, and Defendants request that it be dismissed with prejudice.

### 3.   NeuroGrafix Lacks Constitutional Standing to Sue Because it Has Only a Bare Power to Sue Without Any Exclusive Right to Practice.

Defendants request that any claims by NeuroGrafix be dismissed for the same reason as the claims by IBSC, because NeuroGrafix retains, at best, a non-exclusive license to use the '360 patent in the field of non-human medicine.  As a non-exclusive licensee, NeuroGrafix lacks constitutional standing and cannot sue.  The fact that the contract purported to retain for NeuroGrafix the power to sue for infringement, that bare contractual pronouncement cannot cure a constitutional lack of standing.  *See Propat*, 473 F.3d at 1190 (holding the right to sue cannot

be exercised without some exclusive right to the patent); *Diodem, LLC v. Lumenis Inc.*, No. 2:03-cv-02142, 2005 WL 6219898, at *9-11 (C.D. Cal. Sept. 14, 2005) ("[T]he purported grant of a bare 'right to sue,' which is assigned in isolation, divorced from any accompanying exclusive right to make, use, vend, or otherwise practice the invention within a licensed field of exclusivity amounts to nothing more than the disguised grant of a bare 'right to sue,' which cannot provide a basis for standing . . . .").

Like the license at issue in *Propat*, the NeuroGrafix-NIMA License is primarily concerned with NIMA's licensing rights and royalty obligations, except that it also expressly reserves for NeuroGrafix the right to sue for infringement and control.  Ex. 13 § 6.2.  As noted above, however, the attempt to give any exclusive rights was ineffective, and a bare licensee can have no constitutional standing to sue, regardless of the terms of any contract.  *See Propat*, 473 F.3d at 1193-94 ("A bare licensee cannot cure its lack of standing by joining the patentee as a party.").

### 4.  NIMA Has No Right to Sue

While NeuroGrafix has no standing to sue, NIMA is expressly excluded from pursuing an infringement action by the terms of the NeuroGrafix-NIMA License.  Ex. 13 § 6.2 ("Licensor [NeuroGrafix] has the <u>exclusive</u> right to sue for any infringement by Third Parties.") (emphasis added).  The explicit language of this section states that NeuroGrafix is the only party to "pursu[e] such action."  *Id.*  At best, NIMA is limited to "assist[ing]" NeuroGrafix.  *Id.*  A right to assist in a lawsuit, however, is not the same as a right to join the lawsuit as a party.  Moreover, the right to assist NeuroGrafix is plainly insufficient here because NeuroGrafix itself lacks standing to pursue these actions.  NIMA therefore cannot "assist" NeuroGrafix.  Finally, to the extent Plaintiffs asserted that this provision supports a right to sue, this would further support Defendants' argument that WRF retained substantial rights because the WRF-NeuroGrafix License includes nearly identical language obligating WRF to assist NeuroGrafix in litigation.

28

*See* Ex. 12 § 7.2.[11]

### D. Plaintiffs Have Not Demonstrated That Leave to File Amended Complaints Would Be Justified, and The Court Should Dismiss With Prejudice.

In light of the foregoing, the Court should dismiss the complaints with prejudice.  The

Court should not grant leave for Plaintiffs to amend the complaints.[12]  In its extensive litigation

concerning the '360 patent, Plaintiffs have had ample opportunity to enter into a licensing

agreement that unambiguously grants them all substantial rights to the '360 patent.  This is

especially true in light of the ruling in NeuroGrafix's previous litigation with Siemens Medical

Solutions, USA, Inc., that the 1998 Agreement between WRF and NeuroGrafix did not transfer

substantially all rights to NeuroGrafix.  *See* Ex. 18, *NeuroGrafix v. Siemens Med. Sol'ns, USA, Inc.*,

No. SA CV 10-1990 MRP (RZX) (C.D. Cal. June 30, 2010) (Order Regarding Motion to Dismiss).

Yet, Plaintiffs have, inexplicably, failed to do so.  *Cf. Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427

F.3d 971, 980 (Fed. Cir. 2005) (upholding dismissal with prejudice where plaintiff had a chance to

cure prudential standing defect and failed to do so).  Moreover, in a curious strategy, Plaintiffs

already attempted to bring these actions with pleadings that apparently were intended to conceal

the existence of the Amended Agreement, despite the fact that it had been entered into prior to the

filing of the complaints.  At this point, Plaintiffs' strategic maneuvers to conceal their inadequate

---

[11]  Plaintiffs previously asserted that NIMA has the right to sue because it has the right to "participate in patent litigation," but Plaintiffs cited no evidence as to where NIMA obtained this participatory right.   Ex. 19 (Opp. to Mot. to Dismiss in *University of Chicago*) at 12 (emphasis omitted).

Plaintiffs also pointed to section 2.1 of the NeuroGrafix-NIMA agreement to argue that NIMA's "exclusive" rights revert to NeuroGrafix "if a court finds that NIMA does not have standing to sue." Ex. 13 § 2.1.  Such a "drafting incompetency contingency" clause cannot confer standing – it only shows that the drafters did not have confidence in their ability to draft a license to properly confer standing.

[12]  An amendment to add a party as a plaintiff would not cure constitutional standing issues.  *See Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202-03 & n.3 (Fed. Cir. 2005) (constitutional standing must exist at the time of the complaint).

standing to enforce the patent-in-suit should bar them from further attempts at bringing these defendants into court. Accordingly, the Court should dismiss with prejudice. *See id.*

### E. If the Court Does Not Immediately Dismiss This Case, Focused Jurisdictional Discovery is Warranted Based on Plaintiffs' Responses So Far.

If the Court does not grant Defendants' consolidated motion to dismiss, then Defendants request discovery specifically directed to the standing issue, and that discovery on other issues be stayed. If Plaintiffs want this Court to rely on testimony regarding events from 1994, Defendants are entitled to explore the credibility of Plaintiffs' witness and the reliability of his statements and to discover any additional facts and documents relevant to the agreements at issue. Moreover, given the highly fractured ownership and licensing history of the '360 patent, significant questions remain as to who would need to be joined as a plaintiff to "cure" prudential standing concerns and whether any research funding agencies and entities, *e.g.*, the NIH and GE Medical Systems, co-own the patent and, because of their absence, eliminate the plaintiffs' standing. *See Lucent Techs., Inc. v. Gateway, Inc.*, 543 F.3d 710, 722 (Fed. Cir. 2008) (dismissal for lack of standing where co-owner was not joined).

## V. CONCLUSION

There are critical defects at every step in the chain of title from the UW to the Plaintiffs, and any one of those defects precludes Plaintiffs standing to sue. As a result, the Plaintiffs lack both constitutional and prudential standing to bring these actions, and Defendants' motion to dismiss should be granted.

Dated: May 14, 2013                    Respectfully submitted,

                                       ___/s/ Michael A. Molano___
                                       Michael A. Molano (California SBN 171057)
                                       MAYER BROWN LLP

Two Palo Alto Square, Suite 300
Palo Alto, CA  94306
(650) 331-2000
mmolano@mayerbrown.com

Designated Lead Counsel for Defendants in All
Member Actions.

Agreed:

/s/ Charles S. Hirsch
Charles S. Hirsch
BALLARD SPAHR LLP
300 East Lombard Street
Baltimore, MD 21202
(410) 528-5600
Hirsch@ballardspahr.com

Katrina M. Quicker
BALLARD SPAHR LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Phone: 678.420.9330
Fax: 678.420.9301
quickerk@ballardspahr.com

Counsel for Defendants The Johns
Hopkins University and The Johns
Hopkins Hospital

/s/ Kyle B. Fleming
Kyle B. Fleming
RENNER, OTTO, BOISSELLE &
SKLAR, LLP
1621 Euclid Avenue
Nineteenth Floor
Cleveland, Ohio 44115
Telephone: +1 (216) 621-1113
Facsimile: +1 (216) 621-6165
Email: kfleming@rennerotto.com

Counsel for Defendants Brainlab, Inc.
and Brainlab AG

31

**CERTIFICATE OF SERVICE**

I, Michael A. Molano, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on the date of filing.

Date:   May 14, 2013                         /s/ Michael A. Molano
                                             Michael A. Molano

32