UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MDL NO. 13-2432-RGS

In re: NEUROGRAFIX ('360) PATENT LITIGATION

MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION TO SUPPLEMENT THE COMPLAINTS
AND CONSOLIDATED DEFENDANTS' RENEWED
MOTION TO DISMISS

March 24, 2014

STEARNS, D.J.

In the summer of 2012, plaintiffs NeuroGrafix, Neurography Institute Medical Associates, Inc. (NIMA), and Image-Based Surgicenter Corporation (IBSC), launched a fusillade of lawsuits against MRI equipment manufacturers and university and hospital end-users, accusing them of infringing U.S. Patent No. 5,560,360, "Image Neurography and Diffusion Anisotropy Imaging" ('360 patent). Nine pending cases were consolidated by the Multidistrict Litigation Panel (MDL) in this court for pretrial proceedings. Plaintiffs now move to supplement the original complaints, while defendants by way of a cross-motion seek a dismissal of the complaints for want of standing.[1]

---

[1] This Renewed Motion to Dismiss is brought by defendants in four of the consolidated cases: *NeuroGrafix v. BrainLab, Inc., et al.*, C.A. No. 12-6075 (N.D. Ill.); *NeuroGrafix v. Philips Electronics North America Corp., et al.*, C.A. No. 12-11065 (D. Mass.); *NeuroGrafix v. The University of Chicago Medical Center, et al.*, C.A. No. 13-10759 (N.D. Ill.); *NeuroGrafix v. The Johns Hopkins University, et al.*, C.A. No. 12-02181 (D. Md.). The remaining five cases are

# BACKGROUND

The inventors[2] of the '360 patent assigned their rights in the invention to The University of Washington (UW) at Seattle and St. George's Hospital Medical School (St. George's) of London in 1993.[3]  In order to exploit the neurography technology covered by the patent, UW sought to license the assigned rights to the Washington Research Foundation (WRF), a non-profit vehicle through which UW commercializes intellectual property.  To this end, UW, WRF, and St. George's negotiated a Technology Administration Agreement (TAA) under which WRF was to acquire an exclusive license to the technology from UW.  The TAA provided that "St. George's agrees to assign to UW all right, title, and interest" that it holds in the '360 patent.  TAA § 2.1. UW, in turn, "agree[d] to exclusively license to [WRF] all right, title and interest UW has or may later acquire or become entitled to, including St. George's rights assigned [pursuant to the TAA]." *Id*. § 2.2.[4]

---

stayed pending disposition of the motion.

[2] Drs. Aaron G. Filler, Jay S. Tsuruda, Todd L. Richards, and Franklyn A. Howe are the listed co-inventors of the patent.

[3] The '360 patent teaches a technology for enhancing neural magnetic resonance imaging.  The technical details of the patent have no bearing on this motion.

[4] Section 2.2 of the TAA states that the UW-WRF license "shall be in substantially the form attached hereto as Exhibit A."  The Agreement, however,

On March 9, 1994, WRF mailed St. George's a draft of the TAA that included as an exhibit a preliminary form license between UW and WRF. One week later, representatives of WRF met with representatives from St. George's in England and agreed in principle to the terms of the TAA. WRF then requested an exclusive license from UW "to proceed proactively with [the neurography] patenting and licensing activities . . . ." UW and WRF executed the license on March 23, 1994 (UW-WRF license). St. George's signed the TAA two months later on May 31, 1994. Some fourteen years later, in 2008, St. George's got around to assigning its rights in the '360 patent to UW "in compliance with the Technology Administration Agreement," retroactive to May 31, 1994.

In December of 1998, WRF executed an "Exclusive License Agreement" with NeuroGrafix, granting NeuroGrafix the "exclusive rights to make, use, and sell Licensed Products" that "rely[] fully or in part on [the '360] Patent Rights for their development, manufacture, or use." 1998 WRF-NG license § 2; § 1.7, App. A. In September of 2011, plaintiffs in this action divvied up the '360 patent rights among themselves. NeuroGrafix first entered into an agreement

_____

does not have an attachment explicitly labeled Exhibit A. Plaintiffs contend that the draft agreement attached to WRF's March 9, 1994 letter to St. George's was the intended Exhibit A.

3

with NIMA purporting to grant NIMA an exclusive license to the '360 patent. NIMA, in turn, granted back to NeuroGrafix an exclusive license in the patent limited to the field of non-human medicine. NIMA then granted IBSC an exclusive license to the patent limited to the field of surgical medicine. Finally, in June of 2012, WRF and NeuroGrafix executed an "Amended and Restated Non-Terminable Exclusive License Agreement," (WRF-NG license) the purpose of which was to "remove WRF as a necessary party to actions where [NeuroGrafix] asserts the Patent Rights against Third Party infringers and related actions." WRF-NG license, Recital F.

After the complaints were consolidated by the MDL Panel, the non-stayed defendants moved to dismiss, alleging various defects in the chain of title that, if substantiated, would presumably strip plaintiffs of the constitutional and prudential standing necessary to maintain suit for infringement of the '360 patent. A hearing on defendants' motion was held on November 1, 2013. Before argument on the merits of the motion began, plaintiffs informed the court that they would agree to dismiss the complaints without prejudice in order to amend a provision in the WRF-NG license authorizing lawsuits against "third parties," a provision which the Court of Federal Claims had held in a separate case did not include the right to sue the United States. *See NeuroGrafix v. United States*, 111 Fed. Cl. 501, 506-508 (Ct.

Fed. Cl. 2013).  The court gave plaintiffs the option of amending the existing complaints or dismissing them without prejudice.

In December of 2013, plaintiffs executed six new assignments and licenses.  UW assigned its rights to the '360 patent to WRF, which in turn assigned its rights in the patent to NeuroGrafix, which then passed them on to the next-in -line, Dr. Aaron Filler, one of the named inventors of the '360 patent and the principal of NeuroGrafix, NIMA, and IBSC.  Dr. Filler next granted an exclusive license to the '360 patent back to NeuroGrafix, which passed it down the chain to NIMA and, finally, to IBSC.  Plaintiffs then moved to file a supplemental complaint under Fed. R. Civ. P. 15(d) incorporating the new agreements.[5]  Defendants responded by renewing their motion to dismiss the original complaints and with an opposition to plaintiffs' motion to supplement the pleadings.

## STANDARD OF REVIEW

Plaintiffs bear the burden of establishing standing to prosecute patent infringement claims.  *See Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990).

---

[5] "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).  A motion to supplement a pleading is scrutinized under the same standard as applicable to a motion to amend. *Mueller Co. v. U.S. Pipe & Foundry Co.*, 351 F. Supp. 2d 1, 2 (D.N.H. 2005).

The question of standing to sue under the Patent Act is a jurisdictional one. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995). "Under Fed. R. Civ. P. 12(b)(1), a party may contest the court's subject matter jurisdiction by challenging the allegations in the complaint as insufficient on their face or by questioning the accuracy of those allegations." *Hernandez-Santiago v. Ecolab, Inc.*, 397 F.3d 30, 33 (1st Cir. 2005). "Where a party challenges the accuracy of the pleaded jurisdictional facts, the court may conduct a broad inquiry, taking evidence and making findings of fact." *Id.* In reviewing a factual challenge to jurisdiction, "the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

DISCUSSION

## Standing Under the Patent Act

The Patent Act limits standing to bring an infringement suit to "a patentee." 35 U.S.C. § 281. A "patentee" includes "the party to whom the patent was issued," as well as "successors in title to the patentee." 35 U.S.C. § 100(d). An exclusive licensee is deemed a successor in title if the patent owner transfers "all substantial rights" in the patent to the licensee. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 874 (Fed.

6

Cir. 1991) (licensing of all substantial rights in a patent amounts to an assignment and the licensee is therefore a patentee). An exclusive licensee has constitutional standing to sue for infringement in its own name. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007). A licensee that holds exclusionary rights to a patent, but not all substantial rights, must join the patentee who transferred the exclusionary rights to satisfy prudential standing concerns. *Id.* ("[T]he patentee is joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer."). Finally, a non-exclusive licensee lacks constitutional standing even if the patentee is joined in the action because the licensee does not meet the injury-in-fact requirement of constitutional standing. *Id.* at 1340-1341.

To maintain a suit for patent infringement, a plaintiff must have constitutional standing to sue on the date the lawsuit is filed. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010). If the plaintiff "lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured after the inception of the lawsuit." *Id.* (internal quotations and citation omitted). It follows that the critical date for determining whether a plaintiff holds "enforceable title" to the patent-in-suit is the date the original complaint was filed, and not the date the complaint was

amended or supplemented. There is a pertinent exception: a licensee that holds only exclusionary rights to a patent may satisfy prudential standing requirements *after* a complaint is filed because it "had a cognizable injury at the inception of suit for the purpose of Article III standing, based on its exclusive license to the patent." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1310 (Fed. Cir. 2003). Moreover, a plaintiff with standing to sue may assign its rights to the patent-in-suit during the litigation, thereby conferring its right to maintain the action on the assignee. *See Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 662, 666 (E.D. Va. 2010), citing *Mas-Hamilton Grp. v. LaGard Inc.*, 156 F.3d 1206, 1210-1211 (Fed. Cir. 1998).

**UW-WRF License**

Defendants allege that whatever the import of the flurry of back-and-forth assignments and licenses in December of 2013 , the present plaintiffs do not have standing to pursue infringement claims because NeuroGrafix lacked constitutional standing when the original complaints were filed. The argument has several layers. In the first instance, defendants maintain that the TAA extinguished UW's license to WRF leaving it with no rights to transfer to NeuroGrafix. The TAA, which was executed two months after the UW-WRF license, includes an integration clause stating that the TAA "completely

8

supersedes all previous understandings and obligations between the parties pertaining to the St. George's Technology and the UW Technology." TAA § 10.1. Because the UW-WRF license predated the TAA and no license was executed after it was signed, the integration clause, as defendants read it, effectively terminated WRF's license from UW, leaving UW with all of the substantial rights to the '360 patent. Plaintiffs respond that the common-sense purpose of the TAA was to effectuate the granting of the license by UW to WRF, and that despite their sequential execution, the documents were intended by the parties to be read together.

To resolve the dispute over the TAA's effect, the court must first decide which body of State law governs the interpretation of the contract.[6] Because this case arises under the U.S. Patent Act, federal conflict of law principles apply. *See Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 25-26 (1st Cir. 2000), citing *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642 (1981). These principles are derived from the Restatement (Second) of Conflict of Laws, "which provides that the laws of the jurisdiction with the most significant relationship to the contract should govern its interpretation." *Great Clips, Inc. v. Hair Cuttery of Greater Boston, L.L.C.*,

---

[6] The TAA does not include a choice-of-law provision.

2009 WL 458554, at *3 n.5 (D. Mass. Feb. 18, 2009), citing Restatement (Second) § 188(1); *Edelmann v. Chase Manhattan Bank, N.A.*, 861 F.2d 1291, 1295 (1st Cir. 1988).

Two of the three parties to the TAA – UW and WRF – are citizens of and based in the State of Washington. The third party – St. George's – is based in London, England. The TAA, however, provides for the assignment of St. George's rights in the '360 patent to UW for the explicit purpose of enabling UW to enter into an agreement with WRF to manage the exploitation of the '360 patent in the State of Washington. Because the State of Washington clearly has the most significant relationship to the TAA, its law governs.[7]

Under Washington law, "[t]he cardinal rule with which all interpretation begins is that its purpose is to ascertain the intention of the parties." *Berg v. Hudesman*, 115 Wash.2d 657, 663 (1990) (en banc). Washington courts interpret contracts applying the "context rule," which permits a court to look to extrinsic evidence to determine the intended meaning of a contract, even where its language is clear and unambiguous. *Id*. (adopting Restatement (Second) of Contracts §§ 212, 214(c)).

> The Court may consider (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the

---

[7] Defendants do not disagree.

contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties.

*Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1033 (W.D. Wash. 2012), quoting *Spectrum Glass Co. v. Pub. Util. Dist. No. 1*, 129 Wash. App. 303 (Wash. Ct. App. 2005).

Here, there can be no doubt that the intent and purpose of all three parties to the TAA was to grant WRF an exclusive license to the neurography technology comprising the '360 patent. Article 2 of the TAA calls for St. George's to assign its rights to the technology to UW and for UW to exclusively license its rights, "including St. George's rights," to WRF. The remainder of the TAA sets out WRF's obligations under the license and the rights of UW and St. George's to benefit from any proceeds realized by WRF's commercialization of the patent. To read the TAA to accomplish the exact opposite of this purpose would defy not only logic, but also the "well-established rule that, where one construction would make a contract unreasonable or such as prudent men would not ordinarily enter into, while another, equally consistent with the language, would make it reasonable, fair, and just, the interpretation which makes it a rational and probable agreement must be adopted." *Dickson v. Hausman*, 68 Wash. 2d 368, 371 (Wash. 1966).

Moreover, the conduct of the parties before and after the execution of the TAA supports plaintiffs' proffered construction. After St. George's received the draft of the TAA (which included a draft of the UW-WRF license), UW and WRF executed their license with the stated purpose of "proceed[ing] proactively" with the commercialization of the neurography technology. Although the TAA was not signed for another two months, all three parties performed in conformity with the transfer of rights contemplated by the TAA and the UW-WRF license. Consistent with its obligations under the license, WRF prosecuted patent applications on the neurography technology and provided periodic reports on its efforts to UW. Neither UW nor St. George's objected to WRF's management of the technology nor took any action inconsistent with WRF's exclusive license. As the final icing on the cake, in 2008, St. George's memorialized the assignment of its rights to UW, retroactive to the date of the TAA. In other words, the conduct of the parties over a nearly thirty-year span bespeaks of the TAA's ratification, not termination, of the UW-WRF license.

At the next level, defendants argue that even if the UW-WRF license survived the TAA, UW could not have granted WRF the rights it received from St. George's because St. George's assignment was retroactive only to the date of the execution of the TAA. This argument, which deserves high marks for

ingenuity, fails for the reasons the termination argument comes up short.  The TAA expressly states that UW will license to WRF all rights that it "has or may later acquire or become entitled to, *including St. George's rights . . .*, in and to the St. George's Technology and the UW Technology . . . ."  TAA § 2.2 (emphasis added).  Reading the relevant documents as a contextual whole, it is apparent that the parties intended for all rights in the technology later acquired by UW to vest *sine die* in WRF through the UW-WRF license.[8]

Escalating to yet another level, defendants assert that because the exclusive license granted by UW to WRF did not expressly restrict UW's right to sue for infringement, WRF did not receive all substantial rights in the '360 patent and UW must therefore be joined as a party in this action.  The argument, however, is not supported by the language of the licensing agreement itself, which specifically provides that "[i]n the event that WRF becomes aware of actual infringement of Patent Rights by a Third Party, *the*

_____

[8] On the other hand, the court does not agree with plaintiffs' argument that St. George's assignment of rights to UW retroactive to the date of the TAA automatically vested those rights in WRF through the provision in the UW-WRF License granting to WRF "all rights now or hereafter owned by UW, by assignment from the Inventor(s) . . . ."  UW-WRF license § 1.02.  Because that pass-through clause is restricted to assignments from "inventors" and St. George's is not defined as an "inventor" under the license, *id.* § 1.01, it does not independently bring St. George's assignment within the ambit of WRF's license.

*WRF shall, at its discretion*, use diligence to cease infringement." UW-WRF license § 10.01 (emphasis added). The agreement thus expressly grants WRF the right to enforce the '360 patent without UW's consent, as well as the right to refuse to bring an infringement suit even if UW so requests.

It is true, as defendants point out, that nothing in the license explicitly prohibits UW from bringing an infringement suit.[9] Here again, context matters. There is no evidence that UW has ever attempted to prosecute a claim of infringement of the '360 patent. Rather, UW has conducted itself in conformity with an understanding that WRF is the exclusive '360 patent licensee.

Finally, defendants argue in their reply brief and in the renewed motion to dismiss that the UW-WRF license is directed to a separate patent – No. 5,706,813, "Focal Neurographic Magnetic Resonance Imaging System" ('813 patent) – and not the (albeit related) '360 patent. This out-of-the-box contention finds its source in two shards of arcana. First, defendants identify an inconsistency in the description of the licensed technology: the draft license

---

[9] Defendants cite language in § 10.01 of the UW-WRF license that permits WRF to identify UW as the owner of the patent if necessary for the prosecution of an infringement claim. This provision does not support defendants' contention that UW retained an implicit unrestricted right to sue. It rather grants an additional right to WRF in aid of its mission as the guardian of the '360 patent.

agreement WRF sent to St. George's on March 9, 1994, refers to the subject matter of the technology as "Image Neurography and Diffusion Anistropy Imaging," while the UW-WRF license executed on March 23, 1994, refers to it as "Technique and Apparatus for Image Neurography." Second, a March 22, 1994 cover letter from WRF to UW attaching the final draft of the UW-WRF license references a "New Invention Disclosure." Defendants contend that the referenced new invention is the subject matter of the '813 patent and therefore the subject of the UW-WRF license.[10]

To buttress this theory of patent confusion, defendants repaired to the Washington Public Records Act in November of 2013, demanding a copy of the "New Invention Disclosure" referenced in the March 22, 1994 WRF letter. UW responded with a three-page document titled "Preliminary Patent Disclosure" dated April 3, 1994.[11] The subject matter line of the preliminary disclosure

---

[10] The '813 patent had its genesis in an application filed on June 6, 1994 (and eventually issued by the PTO on March 18, 1997). The '360 patent application was filed on March 8, 1993, and claimed priority from United Kingdom applications filed beginning on March 9, 1992. How WRF in its March 23, 1994 letter was able to anticipate an event that did not occur until some two and one-half months later is not fully explained.

[11] Plaintiffs' motion to strike the "New Invention Disclosure" exhibit is DENIED. The document should have been produced by plaintiffs without the need to resort to a public records request. Further, plaintiffs were permitted to file a sur-reply to respond to defendants' new argument and did so (introducing their own documents).

document is "Neurographic Image Plane Optimization" and the document is singly authored by Dr. Filler. By contrast, the subject matter of the UW-WRF license is described as a "Technique and Apparatus for Image Neurography" (more or less echoing the title of the '360 patent) and the described technology is claimed by four inventors (not just one). Even more telling is the fact that the April 3, 1994 "Preliminary Patent Disclosure" post-dates WRF's March 22, 1994 letter.[12]

Defendants' theory, in short, gains little or no traction from the "New Invention Disclosure" document. It is beyond cavil that the TAA is addressed to the '360 patent. The Agreement defines the subject technology as "inventions, processes, formulae and the like concerning Image Neurography

---

[12] Undaunted, defendants argue that the "orthogonal image planes" referred to in the "disclosure" letter is the subject matter of the '813 patent and that therefore the UW-WRF license draft attached to the letter has nothing to do with the '360 patent. This assertion appears to be based on a word count: defendants have determined that the term "orthogonal image planes" appears forty-nine times in the '813 patent compared to four times in the '360 patent, ergo the "new disclosure" must be the subject matter of the '813 patent. But this argument misses the point. Even if the disclosure relates to the '813 patent, it is implausible that the UW-WRF license concerned a preliminary disclosure made *after* the execution of the license agreement. The cover letter itself references the meeting between WRF and St. George's, which, as explained above, undisputably concerned the '360 patent. Although UW's provision of the three-page document a full twenty years after the event does sow some confusion, it is simply implausible that the license concerns a patent ultimately issued in 1997, instead of the '360 patent, the subject of negotiations between the parties at the time.

and Diffusion Anisotropy Imaging" – the precise title of the '360 patent – "described in PCT Application Serial No. PCT/US93/02036" – the international analog of the '360 patent application. *See* TAA §§ 1.1, 1.2. WRF provided St. George's with a draft of the TAA on March 9, 1994, together with a draft of the UW-WRF license titled "Image Neurography and Diffusion Anisotropy Imaging" with an assigned "Tech ID" number of 12-92-132. On March 17, 1994, WRF and St. George's met to review the draft TAA and the proposed license. St. George's voiced no objection to its terms. One week later, on March 22, 1994, WRF sent UW the UW-WRF license titled "Technique and Apparatus for Image Neurography," assigned the identical "Tech ID" number of 12-92-132, and listing as the inventors the same four individuals listed on the '360 patent. Although as defendants point out, the final version of the licenses makes a minor tweak in the wording of the title, both reference the same "TechID" numbers, list the same inventors, and are otherwise identical.[13]

---

[13] Plaintiffs also submit two documents created around the time the '360 patent was filed that link its title, "Technique & Apparatus for Image Neurography," with the TechID number 12-92-132. The first is a letter dated February 16, 1993, from UW's Director of Technology to the Washington Attorney General's Office requesting that attorney Bruce O'Connor be appointed Special Assistant Attorney General to "assist [UW] in preparing and prosecuting patent applications covering an invention entitled 'Technique & Apparatus for Image Neurography'," carrying the "identifying number" 12-92-132. *See* Pls.' Ex. I. The second document is a letter from O'Connor to UW's Office of Technology Transfer approximately one month later on March 12,

Further complicating defendants' argument is the dearth of evidence that any of the parties ever evinced an interest in acquiring the rights to the '813 patent. A principal witness to the negotiations between WRF and St. George's – John Reagh, the managing director of WRF (who also sent St. George's the draft TAA and UW-WRF license) – offers uncontradicted testimony that the discussions concerned the technology comprising the '360 patent. Moreover, Dr. Filler, a named inventor on both patents, and the founder and principal of NeuroGrafix, NIMA, and IBSC, evinced his understanding that the UW-WRF license is directed to the '360 patent as early as 1998, when WRF licensed to NeuroGrafix the rights to the '360 patent running from the UW-WRF license. In sum, there is no dispute-worthy evidence to support defendants' argument that the infant patents were mistakenly switched at birth.

**WRF-NG License**

Defendants next contend that NeuroGrafix did not have constitutional standing at the time it filed this lawsuit because the WRF-NG license defines

---

1993, referencing the same identification number and stating that the '360 patent application titled "Image Neurography and Diffusion Anisotropy Imaging" had been filed on March 8, 1993. *See* Pls.' Ex. J. Thus, the most likely explanation for the discrepancy is that "Technique & Apparatus for Image Neurography" described the underlying invention (from which multiple patents issued) and, at the time, was used interchangeably with the description "Image Neurography and Diffusion Anisotropy Imaging," the title of the one patent application that had then been filed.

"patent rights" as "WRF's rights to granted and pending claims for those patents listed in Appendix A," but no appendix is actually attached to the document. It is clear, however, that the license covers the '360 patent. The operative license for standing purposes is the 2012 agreement that was in place at the time of filing. The original 1998 licensing agreement between WRF and NeuroGrafix was amended in 2012 after Judge Pfaelzer found in a related case that, under the 1998 agreement, WRF retained "the right to control the vast majority of patent infringement cases" and as a result NeuroGrafix had not been granted all substantial rights to the '360 patent. *See NeuroGrafix v. Siemens Med. Solutions USA, Inc., et al.*, No. SA CV 10-1990 MRP, at 10 (C.D. Cal. June 30, 2010). The 2012 agreement states that "[t]he objective of this Amendment is to remove WRF as a necessary party to actions where Licensee asserts the Patent Rights against Third Party infringers and related actions." WRF-NG license, Recital F. The 2012 agreement also adopted the definition of "patent rights" verbatim from the 1998 agreement, including its Appendix A listing the '360 patent. *See also* WRF-NG license, Recitals A-F ("WRF is the exclusive licensee of the [UW] of certain technology regarding Image NeuroGraphy with named inventors Aaron Filler, Franklyn Howe, Todd Richards and Jay Tsuruda . . . . WRF and [NeuroGrafix] desire that the aforesaid technology be developed and utilized to the fullest extent so that

benefits can be enjoyed by the general public. [NeuroGrafix] and WRF are authorized to enter into this Amendment.").

As a fallback, defendants argue that even if the WRF-NG license covers the '360 patent, NeuroGrafix – and thus the other plaintiffs – do not have constitutional standing to sue for allegedly infringing importations or offers to sell because the license only explicitly grants NeuroGrafix the rights to "make, use, and sell Licensed Products." WRF-NG license § 2.1.[14] As an initial matter, defendants cite no case for the proposition that a plaintiff who possesses constitutional standing at the inception of an infringement action cannot later acquire and enforce additional exclusionary rights. Rather, defendants seem to be recasting the argument that plaintiffs lack prudential standing, which is not required at the date of filing. *See Paradise Creations,* 315 F.3d at 1310. Even if defendants' view of the law were correct, plaintiffs would still not be limited in their claims because the clear intent of the 2012 amended agreement was to grant NeuroGrafix all legal rights to the '360 patent, including the rights

---

[14] The Patent Act provides a patentee with "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States . . . ." 35 U.S.C. § 154(a)(1).

to import and offer for sale.[15]

The Federal Circuit has stated that where a licensee receives

(1) the exclusive right to make, use, and sell products covered by the patent; (2) the right to sue for infringement of the patent; and (3) a virtually unrestricted authority to sublicense its rights under the agreement [,] [t]hose provisions themselves strongly favor a finding of an assignment, not a license.

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006); *see also Dexas Int'l, Ltd. v. Tung Yung Int'l (USA)*, 2009 WL 909570, at *8 (E.D. Tex. Feb. 25, 2009) ("The Federal Circuit has explicitly noted that the transfer of an exclusive right to make, use, and sell, coupled with the right to sue and sublicense, strongly favor a finding of an assignment, even when the licensing agreement fails to transfer the right to import or offer for sale."). *Cf. Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010) ("[T]ransfer of the exclusive right to make, use, and sell products or services under the patent is vitally important to an assignment.").

Here, the amended agreement grants NeuroGrafix the right to make, use, and sell products covered by the '360 patent. It also provides that NeuroGrafix

_____

[15] Licensing agreements are construed according to state law. *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1285 (Fed. Cir. 2012). Under the terms of the agreement, the WRF-NG license is governed by the laws of the State of Washington. *See* § 21. Thus, the license is interpreted in accordance with the context rule laid out earlier in this opinion. (The December 2013 license replaces Washington State with California).

will have the "sole responsibility" to sue and control infringement litigation, and the "sole right" to grant sublicenses of the patent. WRF-NG license §§ 7.2-7.3. *See Aspex Eyewear* 434 F.3d at 1342 (right to sue for infringement is a "key factor" in determining whether a grant of rights amounts to an assignment). As the Federal Circuit has stated, these specific provisions "strongly favor" a finding that a party received a valid and complete assignment of patent rights from the patent holder notwithstanding the omission of an explicit conveyance of the rights to import or offer for sale.[16] *See Morrow*, 499 F.3d at 1339-1340 (patentees and their assignees "hold all legal rights to the patent").

**NeuroGrafix-NIMA-IBSC Licenses**

---

[16] Defendants' further jabs at the license ignore the obvious intent of the parties. First, the direction to NeuroGrafix to use "reasonable efforts to develop, market and sell Licensed Products, subject to prudent business judgment" does not signify a retention of control by WRF, nor is there any mechanism for contractual enforcement by WRF should "reasonable efforts" not be made. Second, while the distribution of the proceeds of an infringement action and the retention of royalties are relevant factors in determining whether a license transfers all substantial rights to the licensee, they are not dispositive, and entitled to less weight than those previously discussed. *See Vaupel*, 944 F.2d at 875 (licensee received all substantial rights to patent despite owner's right to receive infringement damages). Finally, NeuroGrafix's inability to sue WRF, its own sublicensees, or the federal government (amended in the superseding December 2013 license) restricts infringement actions against only a small portion of potential infringers (none of whom are defendants in this lawsuit).

Defendants' penultimate standing challenge asserts that the licensing agreements between NeuroGrafix, NIMA, and IBSC purporting to divide NeuroGrafix's exclusive rights in the '360 patent into separate fields of use deprive all plaintiffs of constitutional standing. Under this theory, because each plaintiff "has the right to sell a device capable of being used in any of the fields of use," the "purported exclusivity [is rendered] illusory because none of the three plaintiffs can effectively exclude others from its respective field of use." Def.'s Br. at 25.

The exclusionary rights necessary to constitutional standing may be granted in limited fields of use. *See Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1278-1279 (Fed. Cir. 2007). An exclusive field of use licensee, however, must join the patentee to comport with prudential standing requirements. *Id.* at 1278. As discussed earlier, prior to the December 2013 licenses, NeuroGrafix received all substantial rights to the patent and became "the owner of the patent for standing purposes." *Alfred E. Mann Found.*, 604 F.3d at 1359-1360. The 2013 amended licensing agreement also provided NeuroGrafix with an exclusive license, this time from Dr. Filler. In each case, NeuroGrafix transferred its exclusive rights, except for the right to sue and control litigation, to NIMA, which then licensed its rights to IBSC.

The relevant question for purposes of standing is whether the fields of

use carved out for each plaintiff are actually exclusive, or merely illusory. *See Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202-1203 ("It is well-settled that non-exclusive licensees do not have constitutional standing to sue."). This issue is a reprise of the motion to dismiss in *NeuroGrafix v. Regents of the Univ. of California*, 11-cv-07591 (C.D. Cal. Jan. 4, 2012). In that case, Judge Pfaelzer rejected the argument that NeuroGrafix's retention of sublicensing rights left NIMA with a non-exclusive license to the '360 patent, as well as the contention that NeuroGrafix and IBSC held overlapping and therefore non-exclusionary rights to the patent. *Id.* at 2. Judge Pfaelzer found that

> [t]he circumstances reveal that the three parties, utilizing the same representative, signed the two agreements on the same day for what appears to be the purpose of litigation. In order to achieve their goals in this litigation, the parties desired to divide the field of use rights to the '360 patent and create exclusive licenses. Those parties are now before this Court all arguing for the same interpretation of the agreements – that NeuroGrafix has an exclusive license in the field of non-human, non-surgical medicine, IBSC has an exclusive license in the field of human, surgical medicine, and NIMA has an exclusive license in the field of use of human, non-surgical medicine. Nothing on the face of the documents indicate that the Regents' interpretation is correct or the Regents' interpretation should override the contracting parties' agreed interpretation. Instead, the manifestations indicate that the parties intended to divide the field of use rights such that each party had an exclusive license.

*Id.*

The court agrees with Judge Pfaelzer.  The speculation that a customer might purchase an MRI machine from one plaintiff and use it in a manner that infringes another plaintiff's field of use cannot overcome the clear intention of the parties to explicitly demarcate the rights to use the '360 patent.  Nor have defendants identified a single instance of such "competition."[17]

Defendants also argue that NIMA and IBSC are barred from pursuing an infringement action by the license term granting NeuroGrafix "the exclusive right to sue for any infringement by Third Parties."[18]  This provision, however, does not restrict NIMA or IBSC from *participating* in litigation instituted by or with NeuroGrafix; it simply forbids them from *initiating* patent litigation on their own (as they have refrained from doing here).

**Bayh-Dole Act**

Finally, defendants claim that because the National Institutes of Health (NIH) and GE Medical Systems funded the research that ultimately led to the '360 patent, they *may* be co-owners necessary for standing, although

---

[17] Plaintiffs represent that NIMA does not make or sell any devices, but rather uses the invention of the '360 patent to conduct MRI scans.

[18] Section 6.2 of the December 2013 agreements was altered from the previous version to provide that NeuroGrafix "has the exclusive right to initiate suit for any infringement" and that NIMA and IBSC have "the right to join in any such action . . . ."

defendants offer no evidence that either GE or the U.S. government has asserted an ownership interest in the '360 patent. Rather, defendants rely on a journal article published by co-inventor Dr. Filler expressing appreciation to NIH for funding research that led to the '360 patent, as well as a provision in the TAA and UW-WRF license that states that the patent rights are subject to the Bayh-Dole Act.[19]

The Bayh-Dole Act was passed "to promote the utilization of inventions arising from federally supported research" and to "ensure that the Government obtains sufficient rights in federally supported inventions." 35 U.S.C. § 200. A recipient of federal funds (a "contractor") may "elect to retain title to any subject invention," *id*. § 202(a), by complying with the Act's directives. *See id*. §§ 202(c)(1)-(3). If a contractor fails to comply with these obligations, "the Federal Government may receive title" to the subject inventions. *Id*. § 202(c)(3).[20]

---

[19] Dr. Filler by way of an affidavit avers that during the time the '360 patent was conceived and reduced to practice, he was not supported by a grant from NIH.

[20] If a contractor elects to retain title, the agency that granted the federal funds has the right to receive "a nonexclusive, nontransferrable, irrevocable, paid-up license to practice . . . [the] subject invention," *id*. § 202(c)(4), as well as "march-in rights, which permit the agency to grant a license to a responsible third party under certain circumstances, such as when the contractor fails to take 'effective steps to achieve practical application' of the invention. § 203."

A contractor's failure to comply with the Act, however, grants the government only the "*discretionary* authority to take title." *Central Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1352-1353 (Fed. Cir. 2007) (emphasis in original).

> When a violation occurs, the government can choose to take action; thus, title to the patent may be voidable. However, it is not void: title remains with the named inventors or their assignees. Nothing in the statute, regulations or our caselaw indicates that title is automatically forfeited. *The government must take an affirmative action to establish its title and invoke forfeiture.*

*Id*. (emphasis added); *see also Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys. Inc.*, 583 F.3d 832, 844 (Fed. Cir. 2009), *aff'd* 131 S.Ct. 2188 (2011) ("Thus, the [Bayh-Dole] Act did not automatically void Holodiny's assignment to Cetus, and provided the Government with, at most, a discretionary option to his rights."). Here, the government has not claimed ownership of the '360 patent, nor any other rights related to it. Defendants thus have no recourse under the Bayh-Dole Act. *Central Admixture*, 482 F.3d at 1353. ("[D]efendants have no basis to challenge the government's discretion in not invoking forfeiture.").

---

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2193 (2011).

ORDER

For the foregoing reasons, the consolidated defendants' renewed motion to dismiss plaintiffs' complaints is <u>DENIED</u>.  Plaintiffs' motion to supplement their complaints against the non-stayed defendants is <u>ALLOWED</u>.[21]

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[21] Although plaintiffs name all MDL defendants in their supplemental complaint, the court's ruling extends only to the non-stayed defendants. Moreover, as the MDL consolidates defendants for pretrial proceedings only, the supplemental complaint cannot impose jurisdiction or venue where none existed previously, nor can it be used to re-allege claims against defendants dismissed prior to the initiation of the MDL proceedings.